```
            UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF WEST VIRGINIA
                    AT CHARLESTON
```

**HEIDI KLINE and STEVEN KLINE**

       **Plaintiffs,**

v.                                      Civil Action No. 2:09-cv-1082

**WILMINGTON FINANCE, INC., n/k/a
AIG FEDERAL SAVINGS BANK, a
corporation, VERICREST FINANCIAL,
INC., a corporation, HARBOR MORTGAGE,
INC., a corporation, JAY D. WHITE, an
individual, and JOHN DOE HOLDER,**

       **Defendants.**

## MEMORANDUM OPINION AND ORDER

**Pending is plaintiffs' motion to remand, filed November 3, 2009.**

### I. Background and Procedural History

Plaintiffs are residents of Grant County, West Virginia. (Compl. ¶ 2). Defendant Harbor Mortgage, Inc., is a corporation doing business in West Virginia, with its principal place of business in Pennsylvania. (Compl. ¶ 3). Harbor Mortgage was the broker for the transaction at issue in the complaint. (Compl. ¶ 3). Defendant White is a resident of Fisher, West Virginia, and is also listed under "Broker" in the complaint. (Compl. ¶ 3). Defendant Wilmington Finance, the

lender, is a corporation doing business in West Virginia, with its principal place of business in Pennsylvania.  (Compl. ¶ 4).  Defendant Vericrest Financial, Inc., the loan servicer, has its principal place of business in Oklahoma.  (Compl. ¶ 5).  Defendant John Doe Holder is the current holder of plaintiffs' loan.  (Compl. ¶ 5).

In the summer of 2006, plaintiffs responded to an advertisement by Harbor Mortgage to refinance their home.  (Compl. ¶ 7).  Previously, plaintiffs had a loan with Grant County Bank at a fixed rate, with a monthly payment of around $500.  (Compl. ¶ 8).  Plaintiffs allege that Harbor Mortgage and White induced them into the loan with Wilmington Finance, encouraged them to include their unsecured debts in the mortgage, and promised them a monthly payment of $700 and a fixed rate loan.  (Mem. Supp. Mot. Remand 2; Compl. ¶ 9-10, 35).  Plaintiffs were informed that the monthly payments would decrease after about one year.  (Compl. ¶ 10).

At the closing of the loan, on August 14, 2006, plaintiffs learned that the loan had an adjustable rate and that the monthly payment would be $1,100, but plaintiffs did not understand what an adjustable rate mortgage was and they were not provided an explanation.  (Compl. ¶ 11).  In fact, plaintiffs'

2

loan of $135,000 had a "rate with a floor of 9.25% that would increase to 15.25%."  (Compl. ¶ 12).

Plaintiffs allege that Harbor Mortgage and Wilmington Finance had an ongoing relationship with one another, and that Wilmington Finance assigned the loan to Vericrest pursuant to a pooling and servicing agreement that Wilmington Finance had with Vericrest.  (Compl. ¶ 13, Mem. Supp. Mot. Remand 3).  Plaintiffs' monthly payments began at $1,100, a rate they could not afford, and increased over time.  (Compl. ¶ 16-17).  In October 2008, plaintiffs contacted the servicer, Vericrest Financial, to request a loan modification, but Vericrest did not respond to the request.  (Compl. ¶ 18-22).  Vericrest and its debt collectors instead contacted plaintiffs several times a day regarding plaintiffs' loan payments.  (Compl. ¶ 23).  On June 22, 2009, plaintiffs wrote to Vericrest requesting a statement of account and instructing Vericrest to direct all further communication to plaintiffs' counsel.  (Compl. ¶ 24).  Vericrest continued to attempt to contact plaintiffs directly.  (Compl. ¶ 24).

Plaintiffs instituted this action on August 6, 2009, in the Circuit Court of Kanawha County.  Defendant White was served on August 12, 2009; defendant Wilmington Finance was served on September 8, 2009; and defendants Harbor Mortgage and Vericrest

were served on September 9, 2009.  Wilmington Finance timely removed on October 5, 2009, on the grounds of diversity.  On October 5, 2009, Harbor Mortgage and White filed an answer and a cross-claim against Wilmington Finance, asserting that should they be found liable in this matter, they are entitled to complete indemnification, and/or contribution from Wilmington Finance.  (Harbor Mortgage and White Cr. Clm. ¶ 1).

Plaintiffs allege five counts in their complaint, entitled as follows:

    Count I -- Breach of Fiduciary Duty (Broker)

    Count II -- Unconscionable Contract

    Count III -- Joint Venture, Conspiracy and Agency

    Count IV -- Breach of Contract

    Count VI [sic] -- Illegal Debt Collection

Count I is directed solely to Harbor Mortgage and Counts IV and VI are directed solely to Vericrest Financial.  Only Counts II and III purport to relate to White.  There is no Count V.

In their motion to remand, plaintiffs raise two issues: that defendants have not satisfied the Rule of Unanimity, and that the parties are not diverse.  Plaintiffs assert that White, a West Virginia citizen, destroys diversity, and that White failed to timely consent to removal within 30 days of being

served.  White, who was served on August 12, 2009, filed consent to removal with Wilmington Finance's notice of removal on October 5, 2009, more than 30 days after he was served.  However, our court of appeals has recently held that "[I]n cases involving multiple defendants, each defendant, once served with formal process, has thirty days to file a notice of removal pursuant to 28 U.S.C. § 1446(b) in which earlier-served defendants may join regardless of whether they have previously filed a notice of removal."  See Barbour v. International Union, 594 F.3d 315, 326 (4th Cir. 2010).  Thus, White's consent to removal is timely.

In its response to plaintiffs' motion to remand, joined by Vericrest, Harbor Mortgage and White, Wilmington Finance admits that White, a Harbor Mortgage employee, is a citizen of West Virginia, but asserts that this court may nevertheless exercise diversity jurisdiction over this action due to plaintiffs' allegedly fraudulent joinder of White.  (Mem. Opp. Mot. Remand 2, 6).  The court need only consider whether White was fraudulently joined for the purpose of destroying the parties' diversity.

## II. Governing Standard

In determining "whether an attempted joinder is fraudulent, the court is not bound by the allegations of the pleadings, but may instead consider the entire record, and determine the basis of joinder by any means available." <u>Mayes v. Rapoport</u>, 198 F.3d 457, 464 (4th Cir. 1999) (internal quotation marks omitted).

The fraudulent joinder standard is well settled.  Our court of appeals lays a "heavy burden" upon a defendant removing a case on such grounds:

> In order to establish that a nondiverse defendant has been fraudulently joined, the removing party must establish either: [t]hat there is <u>no possibility</u> that the plaintiff would be able to establish a cause of action against the in-state defendant in state court; or [t]hat there has been outright fraud in the plaintiff's pleading of jurisdictional facts.

<u>Mayes v. Rapoport</u>, 198 F.3d 457, 464 (4th Cir. 1999) (emphasis added) (quoting <u>Marshall v. Manville Sales Corp.</u>, 6 F.3d 229, 232 (4th Cir. 1993)).  The applicable standard "is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss[.]"  <u>Hartley v. CSX Transp., Inc.</u>, 187 F.3d 422, 424 (4th Cir. 1999).

As the decision in <u>Hartley</u> illustrates, fraudulent

joinder claims are subject to a rather black-and-white analysis in this circuit.  Any shades of gray are resolved in favor of remand.  Indeed, "the defendant must show that the plaintiff cannot establish a claim against the nondiverse defendant even after resolving all issues of fact and law in the plaintiff's favor."  <u>Mayes</u>, 6 F.3d at 232.  At bottom, a plaintiff need only demonstrate a "glimmer of hope" in order to have his claims remanded.  As stated in <u>Hartley</u>:

> CSX contests these points and we are unable to resolve them with the snap of a finger at this stage of the litigation. Indeed, these are questions of fact that are ordinarily left to the state court jury.
>
> <u>In all events, a jurisdictional inquiry is not the appropriate stage of litigation to resolve . . . various uncertain questions of law and fact</u>. Allowing joinder of the public defendants is proper . . . because courts should minimize threshold litigation over jurisdiction. Jurisdictional rules direct judicial traffic. They function to steer litigation to the proper forum with a minimum of preliminary fuss. The best way to advance this objective is to accept the parties [as] joined . . . unless joinder is clearly improper.  To permit extensive litigation of the merits of a case while determining jurisdiction thwarts the purpose of jurisdictional rules.
>
> * * *
>
> <u>We cannot predict with certainty how a state court and state jury would resolve the legal issues</u> and weigh the factual evidence in this case. <u>Hartley's claims may not succeed ultimately, but ultimate success is not required . . . . Rather, there need be only a slight possibility of a right to relief</u>. Once the court identifies this glimmer of hope for the plaintiff, the jurisdictional inquiry ends.

7

<u>Hartley</u>, 187 F.3d at 425-26 (emphasis added).

### III.  Analysis

Plaintiffs assert that White's participation in the origination of the unconscionable loan creates a possibility of relief against White under the Unconscionable Contract count and the Joint Venture, Conspiracy and Agency count of the complaint. (Rep. Mot. Remand 3).  The complaint demands judgment against "Defendants" and "each Defendant" in those counts.  White is only mentioned by name in the body of the complaint under the "Broker" category, setting forth the jurisdictional requirements:

> 3. <u>Broker</u>. (a) Harbor Mortgage, Inc. ("Harbor"), is a corporation doing business in West Virginia with its principal place of business at 1424 Easton Road, Suite 200, Horsham, Pennsylvania 19044.  Harbor Mortgage, Inc., was the broker for the transaction at issue.
>
> (b) Defendant Jay D. White ("White") resides at 2156 Walnut Bottom Road, Fisher, West Virginia 26818.

(Compl. ¶ 3).  In the factual allegations, plaintiffs refer to "Defendant brokers" as the parties who encouraged plaintiffs to include their unsecured debts in the mortgage and who promised plaintiffs a $700 monthly payment and a fixed rate loan.  (Compl. ¶ 9-10).  Plaintiffs then received papers in the mail that indicated that the monthly payments on the loan would decrease

after around a year of making payments. (Compl. ¶ 10). The remainder of the complaint at times refers to specific defendants (although never White, specifically), and also refers to "Defendants," "Defendant servicers/holders," "Defendant" and "Defendant servicer." It is ambiguous in much of the complaint as to which defendants are alleged to have committed specific counts of wrongdoing.

A. Joint Venture, Conspiracy and Agency

Under West Virginia law, to the extent that a viable joint venture claim exists, it "'is an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill and knowledge.'" Armor v. Lantz, 535 S.E.2d 737, 742 (W. Va. 2000) (quoting Price v. Halstead, 355 S.E.2d 380, 384 (W. Va. 1987)). "[A] joint venture arises out of a contractual relationship between the parties. The contract may be oral or written, express or implied." Price, 355 S.E.2d at 384; accord Sipple v. Starr, 520 S.E.2d 884, 892 (W. Va. 1999). "[M]embers of a joint venture are . . . jointly and severally liable for all obligations pertaining to the joint venture, and the actions of the joint venture bind the individual co-venturers." Armor, 207

9

W.Va. at 677, 535 S.E.2d. at 742.  "In addition, each venturer is liable for the unlawful acts of a co-venturer when the act is committed within the scope of the venture and with the implied consent of the venturer."  Short v. Wells Fargo Bank Minn., N.A., 401 F.Supp.2d at 563; see also 46 Am.Jur.2d Joint Ventures § 42.

While the West Virginia Supreme Court of Appeals has "never formulated any broad analytical test by which to determine the existence of a joint venture," it has identified the "existence of certain 'distinguishing elements or features' essential to the creation of a joint venture."  Armor, 535 S.E.2d at 743.

> 'As between the parties, a contract, written or verbal, is essential to create the relation of joint adventurers.... To constitute a joint adventure the parties must combine their property, money, efforts, skill, or knowledge, in some common undertaking of a special or particular nature, but the contributions of the respective parties need not be equal or of the same character. There must, however, be some contribution by each party of something promotive of the enterprise.... An agreement, express or implied, for the sharing of profits is generally considered essential to the creation of a joint adventure, and it has been held that, at common law, in order to constitute a joint adventure, there must be an agreement to share in both the profits and the losses. It has also been held, however, that the sharing of losses is not essential, or at least that there need not be a specific agreement to share the losses, and that, if the nature of the undertaking is such that no losses, other than those of time and labor in carrying out the enterprise, are likely to occur, an agreement to divide the profits may suffice to make it a joint adventure, even in the

absence of a provision to share the losses.'
Armor, 535 S.E.2d at 743 (quoting Pownall v. Cearfoss, 40 S.E.2d 886, 893-94 (W. Va. 1946)(citations omitted)).

Another essential ingredient to an allegation of joint venture is control of the joint venture by the participants. Id. at 745. The decision in Armor turned on a lack of evidence in the record of management and control among all of the alleged joint venturers. Id. Emphasizing the significance of this element, the court pointed to seven cases requiring joint venturers to have equal or some degree of control. Id. (citing Bank of California v. Connolly, 36, Cal.App.3d 350, 364 (Ca. 1973); Barton v. Evanston Hosp., 513 N.E.2d 65, 67 (Ill. 1987); Slaughter v. Slaughter, 379 S.E.2d 98, 101 (N.C. 1989); McSorley v. Hauck, 883 S.W.2d 562, 566 (Mo.App. 1994); Brown v. Jones, 503 N.W.2d 735, 738 (Mich. 1993); Hill v. Zimmerer, 839 P.2d 977, 981 (Wyo. 1992); Ackerman v. Landes, 493 N.Y.S.2d 59, 60 (N.Y. 1985)).

Plaintiffs' claim for Joint Venture consists of a single sentence that does not allege the sharing of profits. Neither does it allege either an agreement among all of the parties or some degree of control by each of them. The sentence simply states, "Each of the acts of the Defendants were done in

11

furtherance of a joint venture in which each of the acts of the Defendants were pursued with a joint purpose, and each of the acts of one is the act of the others." (Compl. ¶ 39). In the subheading "Joint Venture" in the factual allegations of their complaint, plaintiffs assert that the lender was in a "PSA or purchasing agreement with certain of the other defendants," that the broker had an ongoing relationship with the lender, and that the lender assigned the loan to "Defendant CIT for servicing under a PSA." (Compl. ¶ 13-15). Plaintiffs have not pled the elements of joint venture, or even identified them.

Similarly, plaintiffs' claims of conspiracy and agency do not assert more than a vague suggestion that conspiracy and agency took place. As to conspiracy, the sole allegation in the complaint states that "the appraiser conspired to commit the unlawful acts, or lawful acts by unlawful means." (Compl. ¶40). As to agency, the complaint simply alleges that "the acts of each Defendant was done as agent/principal for another Defendant." (Compl. ¶ 41). Plaintiffs do not set forth even minimal facts that would render these claims plausible. Rather, it appears that the sole purpose of plaintiffs' Count III is an attempt to rein in each of the named defendants under each of the counts alleged where there is otherwise no support for such attribution

of wrongdoing.

The "short and plain statement" required by Federal Rule of Civil Procedure 8(a)(2) must provide "'fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957), overruled on other grounds, Twombly, 127 S. Ct. at 1969)); see also Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007). Additionally, the showing of an "entitlement to relief" amounts to "more than labels and conclusions . . . ." Twombly, 127 S. Ct. at 1965.  It is now settled that "a formulaic recitation of the elements of a cause of action will not do." Id.; Giarratano v. Johnson, 521 F.3d 298, 304 (4th Cir. 2008).  The complaint need not, however, "make a case" against a defendant or even "forecast evidence sufficient to prove an element" of the claim. Chao v. Rivendell Woods, Inc., 415 F.3d 342, 349 (4th Cir. 2005) (quoting Iodice v. United States, 289 F.3d 270, 281 (4th Cir. 2002)).  Instead, the opening pleading need only contain "[f]actual allegations . . . [sufficient] to raise a right to relief above the speculative level." Twombly, 127 S. Ct. at 1965; Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)(noting the opening pleading "does not require 'detailed factual

allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.").

Count III does not satisfy the Twombly/Iqbal standard as to White and, thus, does not contain a plausible claim against White arising out of joint venture or conspiracy or agency.

B.  Unconscionable Contract

The count of Unconscionable Contract includes several assertions, including that plaintiffs' were unfairly induced into the loan, the loan contained unfair terms, and the loan put plaintiffs in a worse position and in jeopardy of losing their home.  (Compl. ¶ 34-36).  Plaintiffs refer to "the loan" and the "loan agreement" in this count, and it is not immediately clear whether they intend this reference to encompass only the agreement between plaintiffs and the lender, Wilmington Finance, or if "the loan" may be construed broadly to include all of the agreements related to the transaction, including the agreement between the brokers, Harbor Mortgage and White, and plaintiffs, which may have contemplated payment of broker fees out of the proceeds of and as a part of the mortgage loan.  (Wilmington Finance Cross-cl. Ex. A at § 3, "Broker Agreement").

14

In this count, plaintiffs allege that the loan issued to them was unconscionable and induced by unconscionable conduct, in violation of W.Va. Code § 46A-2-121. Section 46A-2-121 provides a remedy for consumers who have entered into consumer loans that contain unconscionable terms or were induced by unconscionable conduct. It states in part,

> (1) With respect to a transaction which is or gives rise to a consumer credit sale, consumer lease or consumer loan, if the court as a matter of law finds:
>     (a) The agreement or transaction to have been unconscionable at the time it was made, or to have been induced by unconscionable conduct, the court may refuse to enforce the agreement, or
>     (b) Any term or part of the agreement or transaction to have been unconscionable at the time it was made, the court may refuse to enforce the agreement, or may enforce the remainder of the agreement without the unconscionable term or part, or may so limit the application of any unconscionable term or part as to avoid any unconscionable result.

W.Va. Code § 46A-2-121.

In determining unconscionability, a court "must focus on the relative positions of the parties, the adequacy of the bargaining position, and the meaningful alternatives available" to the plaintiff. Art's Flower Shop, Inc. v. Chesapeake and Potomac Telephone Co. of West Virginia, Inc., 186 W. Va. 613, 618, 413 S.E.2d 670 (1991). This inquiry considers the circumstances under which the loan is made and is not limited to

15

the terms of the contract itself.  See <u>Orlando v. Finance One of West Virginia, Inc.</u>, 179 W.Va. 447, 450, 369 S.E.2d 882 (1988) ("An analysis of whether a contract term is unconscionable necessarily involves an inquiry into the circumstances surrounding the execution of the contract and the fairness of the contract as a whole.").

Plaintiffs assert that the brokers were involved in the origination of the loan and that plaintiffs were unfairly induced into the loan by misrepresentations, allegedly made by the brokers, that the loan would have a fixed rate of interest and low monthly payments.  That involvement, alleged to be unconscionable conduct inducing them to enter into the loan, as well as the agreements between the brokers and the plaintiffs relating thereto and the legal duties brokers have to borrowers under West Virginia law, may be determinative of an unconscionable contract.  See <u>Arnold v. United Companies Lending Corp.</u>, 204 W.Va. 229, 239, 511 S.E.2d 854 (1998).  Accordingly, the possibility of a claim against White exists under Count II.

## IV. Conclusion

As noted, the standard for determining fraudulent joinder is more lenient than the standard for a motion to

dismiss, and in making the determination of fraudulent joinder the court is not limited to the pleadings and may consider any means available.  <u>Mayes</u>, 198 F.3d at 464, 466.  It is unclear what kind of contract or fee agreement existed between White and Harbor Mortgage and the plaintiffs and what specific actions were taken by each defendant that would constitute unconscionable conduct.  (Rep. 3).  However, resolving all questions of law and fact in favor of plaintiffs, the court is unable to conclude that there is "no possibility" that plaintiffs would be able to establish an unconscionability claim under § 46A-2-121 against White.

Plaintiffs' support for their claim against White appears to be minimal.  However, plaintiffs do present a "glimmer of hope" that they have a possibility of a right to relief against White.  Consequently, fraudulent joinder is not shown.  Inasmuch as the complete diversity requirement is satisfied "when no party shares common citizenship with any party on the other side," and the plaintiffs and White share West Virginia residency, diversity is absent.  <u>Mayes v. Rapoport</u>, 198 F3d. 457, 461 (4th Cir. 1999).

Based upon the foregoing, the court concludes that it lacks subject matter jurisdiction.  The court, accordingly,

ORDERS that plaintiffs' motion to remand be, and it hereby is, granted.  The court further ORDERS that this action be, and it hereby is, remanded for all further proceedings to the Circuit Court of Kanawha County.

The Clerk is directed to forward a copy of this written opinion and order to counsel of record and any unrepresented parties and a certified copy to the clerk of court for the Circuit Court of Kanawha County.

DATED: July 7, 2010

_____
John T. Copenhaver, Jr.
United States District Judge